1  **LAGOMARSINO LAW**
   ANDRE M. LAGOMARSINO, ESQ.
2  Nevada Bar No. 6711
   3005 West Horizon Ridge Parkway, Suite 241
3  Henderson, Nevada 89052
4  T: (702) 383-2864
   F: (702) 383-0065
5  *Attorney for Plaintiffs*

6              **UNITED STATES DISTRICT COURT**

7                  **DISTRICT OF NEVADA**

8

| | |
|---|---|
| 9  SEAN KENNEDY, individual; ANDREW SNIDER; individual, CHRISTOPHER WARD; individual, RANDALL WESTON, individual; RONALD WILLIAMSON, individual, | CASE NO.: |
| 12             Plaintiffs | |
| 13  v. | **COMPLAINT AND** |
| 14  LAS VEGAS SANDS CORP., a Domestic Corporation; SANDS AVIATION, LLC, a Domestic Limited-Liability Company; LAS VEGAS SANDS, LLC, a Domestic Limited-Liability Company; INTERFACE OPERATIONS LLC, a Foreign Limited-Liability Company | **DEMAND FOR JURY TRIAL** |
| 18             Defendants. | |

19

20      Plaintiffs SEAN KENNEDY, ANDREW SNIDER, CHRISTOPHER WARD, RANDALL

21  WESTON, and RONALD WILLIAMSON (collectively "Plaintiffs"), by and through their attorney,

22  ANDRE M. LAGOMARSINO, ESQ. of LAGOMARSINO LAW, allege and complain against

23  Defendants SANDS AVIATION, LLC, LAS VEGAS SANDS, LLC, INTERFACE OPERATIONS

24  LLC, and LAS VEGAS SANDS CORP. as follows below.

25

26

27

28

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

### NATURE OF CLAIM

1. This is a proceeding for monetary damages to redress the deprivations of rights secured to Plaintiffs under the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA").

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343 (3) and (4), which confer original jurisdiction upon this Court of any civil action to recover damages under any Act of Congress providing for protection of civil rights. The Court also has jurisdiction under 28 U.S.C. § 1337 which confers jurisdiction of any civil action arising under any Act of Congress regulating interstate commerce. Jurisdiction with this Court is also established under 29 U.S.C. § 216(b).

3. Venue is appropriate in the District of Nevada since the allegations relative to the proceeding arose in this district and the parties reside in this district.

### PARTIES

4. Plaintiffs are residents of Las Vegas, in the County of Clark, in the State of Nevada.

5. At all times material herein, Plaintiffs were employees of Defendants as company pilots. Defendants contend that Plaintiffs have entered agreements relating to their employment with all the Defendants and their associated entities.

6. Defendants LAS VEGAS SANDS CORP. and LAS VEGAS SANDS, LLC are proprietors of numerous resorts and hotels in Las Vegas, including the Sands Expo and Convention Center, The Venetian, and The Palazzo. LAS VEGAS SANDS CORP. is a publicly traded company.

7. Defendant SANDS AVIATION, LLC provides aviation services to executives and patrons of Defendants LAS VEGAS SANDS CORP. and LAS VEGAS SANDS, LLC. These Defendants also unlawfully provide transportation to other individuals in violation of federal law. The pilots that

SANDS AVIATION, LLC employs are tasked with transporting Defendants' executives, patrons and others to and from Las Vegas.

8. Defendant INTERFACE OPERATIONS LLC provides employment support and payroll for Defendants LAS VEGAS SANDS CORP., LAS VEGAS SANDS, LLC, and SANDS AVIATION, LLC.

### ALLEGATIONS COMMON TO ALL CLAIMS

9. Together as one company comprised of various entities, Defendants make up one of the largest hotel and casino companies in the world.

10. Defendants employed Plaintiffs as pilots to transport Defendants' patrons, executives, friends and others on Defendants fleet of private jets around the world.

11. Plaintiffs were required to "maintain physical stamina." Plaintiffs were also required to "maintain manual dexterity." Plaintiffs were required to "withstand various activities such as frequent walking, sitting for long periods and withstand prolonged standing, stretching, bending and kneeling without restriction." Plaintiffs were also required, as part of their job, to work and be exposed to CRT fatigue, noise, dust, cigarettes and smoke.

12. Plaintiffs' primary duties was not the performance of office or non-manual work related directly to the management or general business operations of the Defendants or the employer's customers.

13. Plaintiffs' primary duties did not include the exercise of discretion and independent judgment with respect to matters of significance.

14. Plaintiffs did not manage Defendants' enterprise, nor did they manage a customarily recognized department of the enterprise.

15. Plaintiffs did not direct the work of two (2) or more full time employees.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864   Facsimile (702) 383-0065

16. Plaintiffs did not have the authority to hire or fire other employees. Plaintiffs did not make suggestions and recommendations as to hiring, firing, advancement, promotion or any other change of status of other employees that were given any particular weight.

17. Plaintiffs' primary duties did not include the performance of work requiring advanced knowledge. They did not perform work which was predominantly intellectual in nature. Their work did not involve the consistent exercise of discretion or judgment.

18. Plaintiffs' work was not in a field of science or learning.

19. Plaintiffs' job description did not require advanced knowledge acquired by a prolonged course of specialized instruction.

20. Plaintiffs' primary duties did not involve the performance of work requiring invention, imagination, originality or talent in a field of artistic or creative endeavor.

21. Upon information and belief, Defendants have centralized supply chain management, financial, computer, payroll and health record systems that are integrated throughout their locations.

22. Upon information and belief, Defendants' labor relations and human resources are centrally organized and controlled. Defendants maintain a common management team as it pertains to Human Resources. Defendants maintain the same system-wide policies and certain employee benefit plans.

23. Upon information and belief, Defendants share common management, including oversight and management by a senior executive team and board of directors.

24. Upon information and belief, Defendants have common ownership.

25. As such, Defendants are the employer (single, joint, horizontal or otherwise) of the Plaintiffs.

26. The United States Supreme Court has long held that time spent waiting for work is compensable if the waiting time is spent primarily for the benefit of the employer.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

27. Las Vegas Sands intentionally refused to pay overtime and intentionally violated the FLSA provisions governing overtime. In addition to oversight of aviation-specific operations and regulatory issues, Defendants' Executive Director of Flight Operations, Thomas Mason, Senior Vice President Paul Gillcrist, and Chief Pilot Jeff Saccoliti had a working knowledge of the FLSA.

28. Defendants also have the benefit of a legal department to advise them on issues related to the FLSA.

29. Defendants maintained illegal pay policies that denied Plaintiffs compensation for all hours worked, including overtime hours. Defendants knew that Plaintiffs were not getting paid for all the hours for which they were entitled to payment.

30. Defendants were put on notice from previous overtime litigation of FLSA overtime requirements.

31. Upon information and belief, Defendants made no effort to obtain an opinion letter from the Department of Labor on whether Plaintiffs were overtime eligible.

32. On different occasions during the relevant time herein, Plaintiffs had communications with Defendants' managers, executives and other employees regarding the topic of overtime.

33. Plaintiffs worked more than eight (8) hours per day and forty (40) hours per workweek without receipt of overtime compensation while they were employed by Defendants for the time between March 27, 2014 and March 27, 2017.

34. Defendants did not compensate Plaintiffs for their overtime work. Plaintiffs' pay stubs delineated that they were paid a "salary" for eighty (80) hours of work over a two (2) week period. Plaintiffs pay stubs also indicated a category of compensation under "regular hourly pay." On other occasions, Plaintiffs were paid at a regular hourly rate only, with no salary at all. Plaintiffs were also paid "holiday pay."

35. Plaintiffs were designated as full-time employees.

36. Plaintiffs were not exempt from overtime compensation under any legal authority.

37. Plaintiffs are not subject to the "Administrative Exemption" under the FLSA.

38. Plaintiffs are not subject to the "Professional Exemption" under the FLSA.

39. Plaintiffs are not subject to the "Executive Exemption" under the FLSA.

40. Plaintiffs are not subject to the "Highly Paid Employee Exemption" under the FLSA.

**THE DEFENDANTS CONTROLLED ALL OF PLAINTIFFS' TIME ON A DAILY BASIS**

41. Plaintiffs are part of a team that allows Defendants to operate on a 24/7 basis and, in doing so, Plaintiffs constantly perform compensable work by being "on demand" for Defendants twenty-four (24) hours a day, seven (7) days a week.

42. Chief Pilot Jeff Saccoliti referred to the pilot's work as *"non-scheduled, on demand flying"* that *"requires a lot of flexibility from everyone."* This work happened *"every day of the year"* according to a 12/31/2015 email to all pilots from Saccoliti.

43. Plaintiffs were on call from the first day of employment. This was reflected by daily and/or unscheduled communications from the Defendants advising them to be ready to respond at any time. Plaintiffs were always required to be ready for "pop-up flights." Defendants expected Plaintiffs to provide the Defendants with an email address and phone number where they could be reached at all times.

44. Plaintiffs are required to regularly and quickly respond to emails, calls and other communications, whether they were considered "off," on "flex time," or "on-call."

45. Plaintiffs, and other similarly-situated pilots, received daily e-mails requiring them to be ready to report to duty at any time. The pilots were required to confirm in a responsive e-mail that they were ready to report to duty at any time. The e-mails would say "be on standby to cover any pop

1 | ups," or "Good morning, please be on standby today to cover any pop ups that may occur" or words

2 | to the same effect. The e-mails required Plaintiffs and other similarly-situated pilots to confirm with

3 | a responsive e-mail.

4 | 46. At any time of the day, night or morning, Plaintiffs would be directed to cover "pop up" flights

5 | as directed by their Dispatch Manager. Plaintiffs were not given the option of refusing to cover

6 | these pop up flights. The pop up flights required Plaintiffs to hustle as if they were in a fire drill and

7 | the schedulers did not "have time to call people twice just to have someone answer their phone."

8 | 47. If Plaintiffs were not able to answer their employer-assigned telephone, Defendants would seek

9 | to contact them on their personal telephone.

48. On very short notice, the Plaintiffs were told that they would be required to stay overnight and

out of town if a pop-up flight would require the pilots to fly at a moment's notice. Plaintiffs would

often go to sleep not knowing if they were or were not flying back to Las Vegas the next day.

49. On other occasions, the pilots were directed to respond to a hangar several hours ahead of a

scheduled flight time in the event a guest wanted to leave early.

50. A pilot's request for time off was subject to being denied.

51. The pilots were also subject to removal from scheduled flights and cancellations at the whim of

the company.

52. The pilots were also told that they would be gone from Las Vegas for weeks at a time.

53. Many times, the Plaintiffs would be told that there would be a pop-up flight with an "as soon as

possible" departure time.

54. During on-call time, Plaintiffs are confined to a fixed and restrictive geographical ring.

55. Defendants send out frequent e-mails requiring Plaintiffs and similarly situated employees to

confirm that they are on stand-by and ready to respond to any pop-up flights. On information and

belief, these e-mails are used as "pin-down" maneuvers to ensure full control over Plaintiffs even when they have no scheduled or pop-up flights.

56. Defendants expect Plaintiffs and similarly situated employees to answer any calls from Defendants immediately and follow any order given without delay.

57. Discipline could be imposed on employees who failed to acknowledge they were available, or failed to accept a call to work.

58. Pop-up flights are quick and erratic.

59. Defendants publish that the Plaintiffs' type of Pilot job is "on call."

60. Defendants also publish that the "Average Hours Per Week" is "40+."

61. Plaintiffs were told that they could have five (5) "days off" per month. However, many times, Plaintiffs were called on those "days off." Other times, five (5) days off could not be accommodated by the Dispatch Manager.

62. Defendants also publish that pilots are required to "work varied shifts, including weekends and holidays." Defendants further publish that the pilots must "work in a fast-paced, busy and stressful environment." Oftentimes, Plaintiffs and other similarly situated pilots were taken off certain flights, rescheduled to other flights and redirected as dictated by dispatch. Flight delays often occurred. On other occasions, Plaintiffs were told that they would have to stay overnight in a location away from Las Vegas, even though the original plan was for that not to occur.

63. When they were on standby, which was nearly every day, Plaintiffs could not perform or were unable to use their time effectively for their own purposes in performing personal activities including, but not limited to: (1) going out of town to visit relatives or friends; (2) engaging in physical activities in areas that surround Las Vegas such as Lake Mead, Mount Charleston, The Valley of Fire, or Red Rock Canyon; (3) going to a movie theater because their phones had to be

turned off; (4) geocaching in the desert; (5) starting a painting project at home because short notice call outs would not permit proper clean-up of equipment; (6) going anywhere with family is impaired because separate cars have to be taken in the event that a short notice call out occurs; (7) confirming that attendance will always occur at special family events for friends and family; (8) taking classes at UNLV or any institution; (9) babysitting family member's children or grandchildren; (10) doing anything that requires a distance from a mobile device because of the requirement that Plaintiffs respond immediately to calls, texts or e-mails; (11) training or participating in any exercise that will result in potential physical fatigue; (12) participating in any activity that could result in mental fatigue; (13) going to yoga at a studio; (14) going outside city limits for activities such as hunting, fishing or shooting; (15) spouse's movements are restricted for pilots with children who need supervision; (16) the pilots cannot be the person designated to pick the children up from school; (17) participating in Karate at a studio; (18) cannot volunteer to fly for such organizations such as the Civil Air Patrol; (19) consumption of alcohol; and (20) consumption of certain medications that may cause drowsiness.

64. Plaintiffs were not able to engage in many personal activities during their on-call time.

65. Plaintiffs could be called upon at any moment by the Defendants. Plaintiffs were not at liberty to violate Defendants' geographic or other personal requirements.

66. Plaintiffs were not able to attend events or participate in activities that prevented them from monitoring their telephone and email transmissions.

67. Plaintiffs were limited in their abilities to entertain at their homes, attend social gatherings, and attend church.

68. Even Plaintiffs' ability to watch television or read was limited because they had to devote attention to their email and telephone transmissions.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

69. Plaintiffs could not attend events that would cost much money because they might be required to immediately leave an activity in order to respond to Defendants' call.

70. Plaintiffs did not receive respite from the on-call status because they were subject to calls or emails twenty-four (24) hours per day.

71. Plaintiffs had to be within ear shot of their mobile devices at all times. In good weather, the Plaintiffs could enjoy some limited outdoor activities. However, at all other times, the Plaintiffs would have to remain inside if the weather would have an effect on the Plaintiffs' ability to hear and respond to their mobile devices.

72. Plaintiffs and similarly situated employees, because of currency and training requirements for aircraft, cannot easily trade on-call time. In addition, Plaintiffs and similarly situated employees are not able to find anyone who could trade their on-call time because everyone employed by Defendants are on-call twenty-four (24) hours a day, seven (7) days a week.

73. Pagers or their equivalent mobile devices cannot ease Plaintiffs' burden since Defendants require Plaintiffs and similarly situated employees to respond immediately.

74. Plaintiffs and similarly situated employees are forced to sacrifice their preferred activities because of Defendants' control. Plaintiffs and similarly situated employees cannot enjoy any activities including, but not limited to activities that: require them to turn off or be away from their phones, have a lengthy clean-up process, require Plaintiffs and similarly situated employees to not have access to their car, require them be further away from the airport, or leave them mentally or physically exhausted.

75. Plaintiffs and similarly situated employees also face the possibility and frequent actuality that a pop-up flight could force them to remain in a foreign locale overnight, or a scheduled flight could

LAGOMARSINO LAW

3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

1  change both time and location which would also force Plaintiffs and similarly situated employees to

2  remain in a foreign locale overnight.

3  76. If the Plaintiffs and similarly situated employees do not answer their phone, Defendants chastise

4  and verbally discipline them.

5  77. Defendants gave Plaintiffs five (5) "days off" a month. These five (5) days were totally optional

6  and some similarly situated employees were not offered them. These five (5) days also were not

7  guaranteed and Defendants could and did call Plaintiffs to pilot pop-up flights.

8

9  78. Plaintiffs and similarly situated employees also accumulate "flex days". These "flex days" were

10  vacation time wherein Defendants allegedly could not call Plaintiffs to pilot pop-up flights.

11  However, there were multiple instances where Defendants did not honor this vacation time.

12  79. Plaintiffs and similarly situated employees are aware that finding another job as a private pilot

13  would be incredibly difficult. As such, Defendants can use extreme control over employees with

14  little risk of turnover.

15

16  80. Plaintiffs were chastised for not immediately responding to messages while on their supposed

17  days off.

18  81. On June 30, 2014, Plaintiff Kennedy went to Disneyland with his family who had come from

19  abroad. Mr. Kennedy went to Disneyland on his "days off". Mr. Kennedy left his phone in his car

20  because he was concerned that the phone would get wet on the rides.

21

22  82. When Plaintiff Kennedy returned to his car, he found that he received numerous text messages

23  from Defendants. These messages directed Mr. Kennedy to pilot a pop-up flight and, when he did

24  not respond, Defendants asked why Mr. Kennedy was not responding to his phone.

25  83. Plaintiff Kennedy called Defendants to tell them he was on his "days off." Defendants informed

26  Plaintiff Kennedy that "days off" did not relieve him of his duties.

27

28

84. Plaintiff Weston had a similar experience when he took a trip up to Zion National Park in Utah on his "days off."

85. While travelling in Utah's Zion National Park, Plaintiff Weston's phone suddenly flooded with e-mails and messages requesting him to respond.

86. Plaintiff Randall Weston called Defendants to inform them it was his day off. Defendants informed him he was still responsible for answering his phone and piloting flights.

87. Defendants retaliated against Plaintiff Weston for inquiring as to his right to overtime pay.

88. On or about January 2016, Plaintiff Weston expressed concern over some of the business practices of Defendants.

89. In response, Defendants scheduled Plaintiff Weston heavily over the next months.

90. Plaintiff Weston flew one hundred and fifty-two (152) hours in three (3) months, far over the average.

91. This retaliation occurred again in May 2016 when Plaintiff Weston again advised Defendants that he believed he was overtime eligible.

92. Defendants scheduled Plaintiff Weston for eight (8) days straight for flights and increased flights over the summer of 2016, ensuring Mr. Weston was constantly away from the Las Vegas area. This retaliation sent a clear message to Mr. Weston and other similarly situated that such attempts to improve the workplace would be met with a negative response.

93. During this time, Plaintiff Weston was denied enjoyment of his home life and endured the additional stress of constant piloting.

94. This type of retaliation was pervasive throughout the employment of Plaintiffs, and Defendants would either schedule them an inordinate amount or rob them of valuable flight experience.

95. The frequency of calls and emails was unduly restrictive. The time for Plaintiffs to respond was unduly restrictive. The geographic restrictions were unduly restrictive. Plaintiffs could not trade on-call responsibilities. Whether Plaintiffs had a mobile telephone or not, their restrictions were not eased.

96. Plaintiffs had to massively sacrifice their personal lives and throw all their energy behind working for the Defendants. The time spent by Plaintiffs waiting to be called was spent primarily for the benefit of Defendants and their business.

## PLAINTIFFS WERE AFFORDED LITTLE TO NO DISCRETION

97. Defendants strictly controlled how Plaintiffs performed their jobs at every opportunity.

98. Defendants require Plaintiffs, when choosing what fuel to purchase, to get Signature fuel. When Signature fuel is not available, Plaintiffs are required to get three (3) official fuel quotes and choose the cheapest option.

99. Defendants would also advise Plaintiffs of any changes in fuel selection procedure.

100. If Defendants believed that Plaintiffs did not follow this procedure, Defendants reprimanded Plaintiffs.

101. Plaintiffs do not have discretion when a plane takes off. The scheduler, patrons, and executives control the take-off time.

102. Plaintiffs also could not control their schedule. Even when a flight was scheduled in advanced, Plaintiffs had to be ready to pilot a fight at any time, as the patrons and executives Plaintiffs flew made the final determination as to take off and landings. These patrons and executive would often would often change their minds as to their desired time.

103. Plaintiffs did not have any authority over the patrons and executives they flew. Defendants attempted to cultivate a culture of acquiescence to passengers' demands.

LAGOMARSINO LAW

3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

104. Plaintiffs have little discretion over their expenses, as Defendants tightly scrutinize Plaintiffs' reports.

105. Defendants set forward a daily limit for everyone on a trip for expenses.

106. Defendants require receipts even for relatively low costing items. Plaintiffs and other similarly situated employees must take a picture immediately of any receipts.

107. Plaintiffs are not in charge of their own goals. Defendants set Plaintiffs' goals for them.

108. Defendants routinely send Plaintiffs operational notes about how they should pilot a plane.

109. Plaintiffs' discretion is further limited by relevant criminal, aviation, and customs law. Furthermore, their on-board computers take much of the burden away from Plaintiffs.

110. Even when relevant criminal, aviation, and customs law should have prevented Plaintiffs from performing their duties, Defendants pressured Plaintiffs into performing as directed. "This is what we do" was frequently the response that Defendants would give Plaintiffs when Plaintiffs expressed concern over illegality.

111. Defendants had a practice and procedure of purchasing unsafe aircraft and refurbishing them.

112. Defendants also ignored Plaintiffs and similarly situated employees when they would advise Defendants that Defendants' aircraft was unsafe and in need of care. Instead, Defendants would delay maintenance.

113. Despite numerous warnings from Plaintiffs and similarly situated employees, Defendants continuously forced Plaintiffs to fly these dangerous planes at the risk of damage and injury. On more than one occasion, Plaintiffs made emergency landings in accordance with aircraft manuals because of Defendants' negligence.

114. Plaintiffs and similarly situated employees had no discretion to refuse to fly the Defendants' dangerous aircraft.

LAGOMARSINO LAW

3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

115. Plaintiff Sean Kennedy had a pop-up flight on September 7, 2012 where he flew to Northern Canada in the Yukon. Mr. Kennedy was originally scheduled to remain on the ground in Northern Canada for one (1) hour.

116. However, Plaintiff Sean Kennedy waited in the aircraft all day September 7, 2012 and the patrons did not come. Mr. Kennedy could not fly back to Las Vegas, Nevada because he was responsive only to the patrons' wishes at the expense of his own desires.

117. The patrons did not advise Plaintiff Sean Kennedy that they would not be departing, nor did Defendants advise Plaintiff Sean Kennedy that the flight would not be taking place that day.

118. After waiting for the patrons all day, Plaintiff Sean Kennedy eventually retired to a nearby hotel out of necessity to avoid pilot fatigue.

119. The next day, September 8, 2012, Plaintiff Sean Kennedy once again waited in the airplane for the patrons to arrive. The patrons did not arrive for the entire day.

120. Once again, out of necessity, Plaintiff Sean Kennedy planned to retire to a nearby hotel. However, at 10:00 p.m., the patron showed up just as the crew was shutting down the aircraft.

121. Plaintiff Sean Kennedy had to retire to the nearby hotel to resolve a customs issue.

122. On September 9, 2012, Plaintiff Sean Kennedy and the crew finally flew back to Las Vegas, Nevada.

123. Defendants illegally utilized foreign workers to fly their planes and forced Plaintiffs and similarly situated employees to work with these workers. Plaintiffs do not have discretion to refuse to work with these workers.

124. On October 3, 2015, flight N789LS operated from Las Vegas, Nevada to Los Angeles, California. A Singapore citizen was the pilot. The pilot was on the Visa Waiver Program. Under the

Visa Waiver Program, foreign nationals are prohibited from gainful employment by a United States business entity.

125. On October 9, 2015, Plaintiff Ronald Williamson piloted flight N789LS operating from Las Vegas, Nevada to Vancouver, Canada. On this flight, multiple Singapore crew members were utilized, again under the Visa Waiver Program, including Singapore citizens as a copilot and as a flight attendant.

126. On October 10, 2015, Plaintiff Christopher Ward piloted flight N572MS operating from Las Vegas, Nevada to Van Nuys, California with another Singapore citizen as a copilot.

127. When Plaintiff Sean Kennedy brought this to Defendants' attention, Defendants proceeded to block pilots' ability from seeing the schedule.

128. Defendants ignore pilot fatigue and force employees to fly despite suffering from pilot fatigue. Plaintiffs do not have the discretion to refuse to fly as directed by the Defendants.

129. On December 16, 2015, similarly situated pilots flew a high-level executive to Macau, China on flight VQBMS. One (1) pilot was seventy-four (74) years old at the time.

130. Upon arriving in Macau, these employees were required to remain on stand-by for any flights the high level executive desired in short notice.

131. The flight left Macau, China for Bangkok, Thailand on December 22, 2015 at 2:35 a.m. GMT and arrived in Bangkok, Thailand at 5:00 a.m. GMT.

132. The crew had to stay on the plane at the request of the high-level executive and prepare for the next leg of the journey, which was not scheduled as per the original itinerary. The plane departed from Bangkok, Thailand at 12:00 p.m. GMT and arrived in Tel Aviv, Israel at 10:20 p.m. GMT.

133. This constituted a minimum of a twenty (20) hour duty day. However, the definition of a duty day as per 14 C.F.R. §91.1057 (a) is the period of time between reporting for an assignment and

release from that assignment. Given the international nature of this flight, the duty day could have been as much as twenty-six (26) hours.

134. Per 14 C.F.R. §91.1059 (c), the duty period for a crew of two (2) pilots, as in this case, can only be up to fourteen (14) hours.

135. Defendants frequently forced Plaintiffs and similarly situated employees to work duty days far beyond federal regulations. Plaintiffs and similarly situated employees had limited discretion to refuse these assignments, especially when overseas or in any foreign locale.

136. Defendants threatened and retaliated against Plaintiff Sean Kennedy for reporting patrons smoking marijuana in the plane. Kennedy did not have discretion to remove Defendants' customers for consuming illegal drugs on the aircraft.

137. On December 21st, 2015, Plaintiff Sean Kennedy was scheduled on N972MS to pick up a patron at Van Nuys, California and fly him to Las Vegas, Nevada.

138. Once on the plane, Plaintiff Sean Kennedy smelled marijuana and asked the copilot if he smelled it too. The copilot confirmed.

139. Plaintiff Sean Kennedy called for the flight attendant. The flight attendant came into the cockpit and confirmed that the patrons were smoking marijuana. Mr. Kennedy told her to tell the passengers to stop smoking marijuana, as the smoke was going into the cockpit. The passenger smoking marijuana refused to listen, and only stopped after Mr. Kennedy asked the passenger three (3) times.

140. Upon landing, two (2) mechanics boarded the plane. They confirmed that there was a distinct smell of marijuana.

141. Jeff Saccoliti, Tom Mason, and Paul Gillcrist arrived on a golf cart and directed the crew to spray air freshener before the next flight. Plaintiff Sean Kennedy explained that the smell came from

the patrons smoking marijuana. Mr. Kennedy suggested that someone call marketing and relay a message to the passenger that he cannot smoke illegal substances in the plane.

142. Paul Gillcrist, upon hearing the suggestion to report illegal substances, responded "it's none of your god damn business what these people do or have back there."

143. Plaintiff Sean Kennedy reminded Paul Gillcrist that interstate carriage of an illegal substance is a felony. Plaintiff Sean Kennedy advised Jeff Saccoliti, Tom Mason, and Mr. Gillcrist that this needs to be handled properly because next time he was going to notify Air Traffic Control.

144. Paul Gillcrist explained that allowing illegal substances is "what we do".

145. On December 25, 2015, four (4) days after the above-referenced event, Plaintiff Kennedy developed a sinus infection and missed five (5) days of work.

146. Defendant Jeff Saccoliti pressured Plaintiff Sean Kennedy into coming back to work early.

147. Plaintiff Sean Kennedy eventually came back before he was fully healed.

148. On January 2nd, 2016, Plaintiff Sean Kennedy was scheduled to fly from Las Vegas, Nevada to Van Nuys, California.

149. The flight was originally scheduled for early in the morning, but the clients changed the flight to 9:00 p.m. Plaintiff Sean Kennedy suffered from pilot fatigue.

150. The flight unexpectedly changed to a 3:00 p.m. departure as directed by the patrons.

151. Plaintiff Sean Kennedy and a copilot completed the first leg and arrived in Van Nuys, California. Prior to departure from Van Nuys, California, Plaintiff Sean Kennedy requested that his copilot take over flying the aircraft because Mr. Kennedy was suffering from pilot fatigue.

152. As the plane began the approach to Las Vegas, Nevada, the pilots received a message to turn around and fly back.

153. The pilots could not fly back because of fuel constraints, so the pilots landed in Las Vegas, Nevada as originally planned.

154. When Plaintiff Sean Kennedy landed, dispatch told Mr. Kennedy that he had to then fly to Long Beach, California. Mr. Kennedy advised that he was fatigued.

155. Plaintiff Kennedy called Chief Pilot Saccoliti to advise him of his fatigue. Saccoliti started yelling, "Gillcrist is going to have your ass for this. Monday morning 10:00 a.m. in the office you are going to get fired for this."

156. During the meeting, Mr. Gillcrist said that he had not decided if Mr. Kennedy was "gonna walk out here with [his] job yet."

157. Plaintiff Sean Kennedy replied that he had done nothing wrong.

158. Paul Gillcrist began to scream at Plaintiff Sean Kennedy and demanded that Mr. Kennedy "shut the fuck up and listen" to what he had to say.

159. Paul Gillcrist chastised Plaintiff Sean Kennedy because Mr. Kennedy was forty (40) years old and "can't do one more trip to LA" while suffering from pilot fatigue.

160. Paul Gillcrist announced that if "that's the case", he does not need Plaintiff Sean Kennedy as an employee.

161. Plaintiff Sean Kennedy explained that his illness was caused by the events of December 21st, 2015.

162. Paul Gillcrist responded if Plaintiff Sean Kennedy "can't handle the smoke then [he is] working in the wrong business."

163. Plaintiff Sean Kennedy explained to Paul Gillcrist that smoke of any kind can inhibit a pilot's ability to fly an aircraft. Paul Gillcrist responded that Mr. Kennedy should find another job if smoke inhalation while piloting an aircraft is an issue for him.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864    Facsimile (702) 383-0065

164. Plaintiff Sean Kennedy then stated that the real issue was the drugs on board the planes that Defendants not only ignore but seemingly encourage. Paul Gillcrist then resorted to false allegations against Plaintiff Sean Kennedy and insults.

165. Paul Gillcrist exclaimed that Plaintiff Sean Kennedy's stay at Defendant Sands Aviation had worn out its welcome and that it may be time to find another job.

166. Paul Gillcrist accused Plaintiff Sean Kennedy of calling dispatch after his flight, screaming and yelling, calling Mr. Kennedy a "prima donna". The call that Mr. Gillcrist referred to lasted ten (10) seconds.

167. Paul Gillcrist stated that Mr. Gillcrist was the "one who hired [Plaintiff Sean Kennedy] and I don't wanna have to fire you. It is best for both of us if you just resign."

168. Plaintiff Sean Kennedy responded that he was not going to resign and that Paul Gillcrist was going to have to fire him. Mr. Kennedy further suggested that Mr. Gillcrist's biggest problem is that Mr. Kennedy refuses "to look the other way."

169. After the meeting, Plaintiff Sean Kennedy asked the dispatcher if the dispatcher thought Mr. Kennedy was yelling. The dispatcher was shocked that Mr. Kennedy would even ask.

170. Paul Gillcrist's assistant later called Plaintiff Sean Kennedy to see if he was ok after enduring Gillcrist's incessant yelling.

171. Defendants illegally conducted a commercial operation against federal regulations and forced Plaintiffs and others similarly situated to fly as part of this illegal commercial operation. Plaintiffs did not have the discretion to refuse to fly on these illegal flights.

172. Defendants held out Sand Aviation as a private carrier that is regulated under the provisions of 14 C.F.R. 91 and 14 C.F.R. 125, along with all taxes applicable. Defendants are prohibited from compensation from flights.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

173. In the summer of 2016, there was a flight conducted for Sony Pictures that included celebrities on one of its flights.

174. As part of the agreements, Sony Pictures had certain requirements for the pilots in terms currency and air time for the plane.

175. Upon information and belief, the similarly situated employees scheduled for this flight read the insurance requirements and realized they did not meet those requirements.

176. The similarly-situated employees brought this to Paul Gillcrist's attention.

177. In response, Paul Gillcrist chastised the pilots, saying that the pilots had cost the company revenue around $79,000.00.

178. Because of the situated employees bringing to the attention of Defendant Paul Gillcrist the possibility of breaking the law, the situated employees were demoted to a less desirable plane.

179. Upon information and belief, this was not an isolated incident of carrying out commercial operations.

180. Plaintiff Sean Kennedy was contacted by customs officials in Bellingham, Washington in conjunction with his pilot duties. Customs officials were concerned that the passengers aboard the flight Mr. Kennedy was piloting were compensating Defendants against federal regulations.

181. Customs also advised Plaintiff Sean Kennedy that customs had been watching Defendants for operating as a commercial airline.

182. Instead of conducting an internal investigation and rectifying the problem, Defendants directed pilots to avoid Bellingham.

183. Defendants also conducted a flight with a Boeing 747 to Tahiti.

184. This flight had sixty (60) commercial passengers including celebrities.

LAGOMARSINO LAW

3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864   Facsimile (702) 383-0065

185. This flight was falsely presented as a "demo" flight, wherein Sands Aviation allowed a third party to fly its airplane for the purpose of facilitating a sale. There was concern that some of the planes were grounded, not flying or generating revenue. Sands Aviation generated revenue by leasing these planes as "demos" to hide their operation as a commercial carrier. Defendants charged cost plus excess fees for these flights.

186. Defendants utilized one (1) of their pilots to fly this plane, despite concerns over the legality of this flight.

187. This was not the only time Defendants conducted business as a commercial airline and used its employees to do so.

188. On December 28, 2015, Defendants utilized a "demo" flight VPVLK to lease a plane to a Saudi prince.

189. Once again, Defendants used employees of Sands Aviation to complete this commercial flight.

190. Defendants also "demoed" a flight for the President of an African nation multiple times. For these "demos", the President would always get the same plane.

191. Upon information and belief, Defendants amassed a fleet to assist with these illegal commercial operations. Sands Corporations owns and operates approximately fifteen (15) airplanes for its private carrier fleet for its two (2) properties in the Las Vegas area.

192. Defendants retaliated against Plaintiff Ronald Williamson and hid patron misbehavior on August 4th, 2016.

193. On August 4th, 2016, Plaintiff Williamson piloted a plane from Houston, Texas to Las Vegas. After the flight, Plaintiff Williamson had been on duty for approximately fourteen (14) hours.

194. The five (5) listed passengers were late for the flight, which forced Plaintiff Ronald Williamson to wait for the passengers, as Plaintiffs were always required to do in the case of late passengers.

195. When the five (5) listed passengers finally arrived, they had a sixth (6th) passenger who was not on the manifest. Plaintiff Ronald Williamson could not use his discretion and tell the unlisted passenger that he could not board the plane.

196. Instead, Plaintiff Ronald Williamson had to wait for a background check, which constituted an approximate thirty (30) minute delay.

197. While waiting, the lead passenger decided he wanted to invite a seventh (7th) passenger. Plaintiff Ronald Williamson could not use any discretion to deny the patron his request. Instead, he had to wait for the background checks and the arrival of the seventh (7th) passenger.

198. While the passengers were waiting for the seventh (7th) passenger, they started their party and consumed alcohol.

199. The seventh (7th) passenger arrived and the necessary checks were complete.

200. During the flight, the passengers were jovial and rambunctious. This quickly turned from a light atmosphere to argument and discord.

201. One (1) of the female passengers asked if she could ride in the jump seat to escape one (1) of the other passengers. Plaintiff Ronald Williamson warned her not to distract the pilots or do anything to compromise safety on approach and landing.

202. The passenger acknowledged the request and enjoyed the flight from the safety of the cockpit. However, a short time later, one (1) of the male passengers came to talk with the female passenger. This quickly turned into an argument between the two (2) passengers.

203. During this argument, there were unexpected thunderstorms which further drew the crew's attention on what preordained procedure to apply to the situation. The crew discussed possible diversion options in accordance with procedure. Finally, the crew determined what the landing fuel permitted.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

204. Plaintiff Williamson requested the male passenger to sit down. His request went unheeded. He repeated his request again.

205. While Plaintiff Williamson conducted his routine approach procedure, he noticed the passenger went to the back of the plane and assumed that the passenger took his seat.

206. The male passenger again came forward to antagonize the female passenger. Plaintiff Williamson reprimanded the male passenger more assertively, which went unheeded. Williamson repeated his instruction. The instruction went unheeded.

207. Plaintiff Williamson advised the male passenger that it would be unsafe for landing should he continue to stand. It appeared the male passenger listened this time.

208. However, during this time, the male passenger urinated on the walls and floor of the plane.

209. Instead of addressing the incident and giving Plaintiffs and others similarly situated more discretion, Defendants chose to "ban" the troubled passenger, but also did not schedule Plaintiff Ronald Williamson to pilot any further flights from August 5th to August 27th, robbing him of valuable flight experience.

210. Defendants used training methods against the federal aviation regulations and forced Plaintiffs and similarly situated employees to train using these methods. Plaintiffs did not have discretion to use other methods.

211. On October 26, 2016, Defendants trained a pilot while a flight attendant was on board.

212. 14 C.F.R. §61.89 (a)(1) prohibits training of a pilot with additional passengers, which are defined as any extraneous individuals other than the trainer and trainee.

213. This was a custom and practice of Defendants to force Plaintiffs and similarly situated employees to train illegal aliens. They did not have discretion to refuse.

LAGOMARSINO LAW

3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

214. Plaintiffs were subject to a point system and progressive discipline for absences and tardiness.

215. The Plaintiffs' job required that they "maintain a professional, neat and well-groomed appearance adhering to VCR appearance standards."

216. The pilots were also required to adhere to the "VCR Unmatched Guest Service Standards." The Plaintiffs and similarly situated pilots were required to wear their uniform with uniform-specific headwear, socks, shoes and other accessories for every shift. All uniforms are required to be pressed and well-fitted.

217. No dress or grooming that was indicative of extreme personal style was allowed. No visible tattoos were allowed. No excessive jewelry was allowed. Hair pieces were not allowed.

218. Hair was required to be neatly trimmed and styled.

219. Facial hair was limited to a mustache only. All facial hair was required to be kept trimmed to less than ½ inch.

220. The pilots' respective name tag was required to be worn, at all times, on the left-hand side of their uniform.

221. Any elective, visible change to a pilot's personal appearance had to be cleared with management first.

222. Any pilot who was found to be inappropriately dressed or groomed would be sent home and subject to progressive discipline.

223. Additionally, Plaintiffs and other similarly situated pilots could only dine, smoke, snack and chew gum during meal or break periods, and only in areas designated by the Defendants.

224. Plaintiffs and other similarly situated pilots were, on occasion, expected to arrange for, and sometimes pick up, grocery food items from Whole Foods for certain of Defendants' guests and family members of executives.

LAGOMARSINO LAW

3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864   Facsimile (702) 383-0065

225. Plaintiffs and other similarly situated pilots were also expected to reserve hotel rooms for Defendants' employees while away from Las Vegas. The Plaintiffs and other similarly situated pilots were also directed to reserve rental cars for Defendants' employees while away from Las Vegas. Per Company policy, all air travel, hotel reservations and care rental are required to be booked through a company approved by the Defendants.

226. Plaintiffs and other similarly situated pilots were directed to purchase fuel from only certain companies.

227. Plaintiffs were required to submit expense reports within strictly delineated deadlines.

228. Plaintiffs and other similarly situated pilots were directed to verify the number of passengers on each flight by referring to the Trip Sheet and advising dispatch who is not on board. The policy applied to flights of Defendants' customers as well as family members and other guests.

229. Plaintiffs and other similarly situated pilots were subject to the Company's progressive discipline procedures which include coaching, personal improvement plan, career decision day, suspension pending investigation, peer review, and termination.

230. Plaintiffs were tightly scrutinized on expenses. Management acknowledged that the expense process was unsavory.

231. Plaintiffs were directed on how to rent cars, both domestically and abroad. The Plaintiffs were directed on how to refuel the rental cars and when to do so. The pilots were told when to drop off rental cars and where.

232. Plaintiffs were required to use pre-trip review checklists. The checklists included the name of the FBO, handling, airport curfew, parking, security assessment, airports lots, catering, hotel, and hotel rewards numbers. Additionally, permits had to be verified such as landing permits, overflight permits, any countries to avoid, and sponsor information.

233. Sands Aviation required that the Plaintiffs use uniform vouchers. The Plaintiffs were told what clothes to wear such as dark navy flat front poly/wool pants and dark navy single breasted suit coats.

234. The Plaintiffs were told the date of the departure, departure airport, the arrival date, the arrival time, and the arrival airport. They were told how many passengers they would carry. On occasion, flights would be delayed by hours or days on the whim of the passengers being transported.

235. The Plaintiffs were required to fill out forms detailing numerous details and equipment readings from each flight.

236. When the Plaintiffs finished their duties on a flight that terminated away from Las Vegas, they were ordered to fly certain airlines on certain dates and times.

## CAUSE OF ACTION #1

**Defendants Owe Plaintiffs Three (3) Years of Unpaid Overtime, Liquidated Damages and Attorney Fees Pursuant To 29 U.S.C. 207(a), 29 U.S.C. §216(b)) and 29 U.S.C. 255(a).**

### (All Plaintiffs Against All Defendants)

237. Plaintiffs re-allege the allegations contained in paragraphs 1 through 236 above.

238. During all material times, the Defendants employed each of the Plaintiffs for work weeks more than forty (40) hours.

239. The Defendants knowingly and willfully failed to pay the lawfully compelled legal overtime rate of one and one-half times the rate of the regular pay at which Plaintiffs were employed, all of which is contrary to and in express violation of 29 USCA § 207(a).

240. Between March 27, 2014 and March 27, 2017, Plaintiff Snider worked a minimum of 10,952 overtime hours.[1] The amount Plaintiff Snider is owed for overtime wages, not including

---

[1] The overtime calculations contained herein are minimum calculations. It is anticipated that discovery will reveal that Plaintiffs are entitled to significantly more in overtime pay and liquidated damages. Calculations of damages will be supplemented accordingly.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864  Facsimile (702) 383-0065

prejudgment interest and liquidated damages, is $1,086,209.76. Because Defendants knowingly and willfully violated 29 USC § 207, Plaintiff Snider is entitled to an additional equal amount in liquidated damages pursuant to 29 USC § 216(b). Therefore, as of March 27, 2017, Plaintiff Snider is owed $2,172,419.52 in overtime and liquidated damages.

241. Between March 27, 2014 and March 27, 2017, Plaintiff Ward worked 13,224 overtime hours. The amount Plaintiff Ward is owed for overtime wages, not including prejudgment interest and liquidated damages, is $1,332,496.00. Plaintiff Ward's damages will continue to accrue after March 27, 2017. Because Defendants knowingly and willfully violated 29 USC § 207, Plaintiff Ward is entitled to an additional equal amount in liquidated damages pursuant to 29 USC § 216(b). Therefore, as of March 27, 2017, Plaintiff Ward is owed $2,664,992.00 in overtime and liquidated damages. These total damages continue to accrue.

242. Between March 27, 2014 and March 27, 2017, Plaintiff Weston worked 14,024 overtime hours. The amount Plaintiff Weston is owed for overtime wages, not including prejudgment interest and liquidated damages, is $1,552,340.64. Plaintiff Weston's damages will continue to accrue after March 27, 2017. Because Defendants knowingly and willfully violated 29 USC § 207, Plaintiff Weston is entitled to an additional equal amount in liquidated damages pursuant to 29 USC § 216(b). Therefore, as of March 27, 2017, Plaintiff Weston is owed $3,104,681.28 in overtime and liquidated damages. These total damages continue to accrue.

243. Between March 27, 2014 and March 27, 2017, Plaintiff Williamson worked 13,376 overtime hours. The amount Plaintiff Williamson is owed for overtime wages, not including prejudgment interest and liquidated damages, is $1,335,161.12. Plaintiff Williamson's damages will continue to accrue since March 27, 2017. Because Defendants knowingly and willfully violated 29 USC § 207, Plaintiff Williamson is entitled to an additional equal amount in liquidated damages pursuant to 29

USC § 216(b). Therefore, as of March 27, 2017, Plaintiff Williamson is owed $2,670,322.24 in overtime and liquidated damages. These total damages continue to accrue.

244. Between March 27, 2014 and March 27, 2017, Plaintiff Kennedy worked 13,864 overtime hours. The amount Plaintiff Kennedy is owed for overtime wages, not including prejudgment interest and liquidated damages, is $1,377,917.60. Plaintiff Kennedy's damages have continued to accrue since March 27, 2017. Because Defendants knowingly and willfully violated 29 USC § 207, Plaintiff Kennedy is entitled to an additional equal amount in liquidated damages pursuant to 29 USC § 216(b). Therefore, as of March 27, 2017, Plaintiff Kennedy is owed $2,755,835.20 in overtime and liquidated damages. These total damages continue to accrue.

245. As of March 27, 2017, the date of this filing of the instant Complaint, the Plaintiffs are owed a total of $13,368,250.24, not including prejudgment interest, costs and attorney fees.

246. As a result of the foregoing unlawful conduct on the part of the Defendants, Plaintiffs have suffered and continue to suffer damages. Pursuant to 29 U.S.C. §216, Plaintiffs further seek liquidated damages in an amount equal to the amount of compensation owed for overtime wages as a result of Defendants willful failure and refusal to pay overtime wages.

247. As a result of Defendants' willful violations of 29 U.S.C. 207(a), Defendants are liable for up to three (3) years of overtime pay for Plaintiffs pursuant to 29 U.S.C. §255.

248. Defendants are liable to Plaintiffs for attorney fees pursuant to 29 U.S.C. 216(b).

## CAUSE OF ACTION #2

**Defendants Have Illegally Retaliated Against Plaintiffs In Violation of 29 U.S.C. §215(a)(3)**

249. Plaintiffs re-allege the allegations contained in paragraphs 1 through 248 above.

250. Plaintiffs asserted their rights by demanding compensation for overtime hours pursuant to the FLSA.

251. When a Plaintiff mentioned that he had a long day in terms of hours, the Executive Director Mason reacted by saying "give me a break." Mason further mocked the Plaintiff by communicating "I feel bad for him."

252. After the Plaintiffs voiced that they were entitled to overtime, the Defendants began to retaliate against them. Plaintiffs had their titles reduced. Certain Plaintiffs were no longer allowed to pilot airplanes transporting certain executives and family members of Defendants' executives. Requests for flex time were refused. Plaintiffs flight hours were manipulated and adjusted to their detriment. Plaintiffs currency and training requirements were diminished.

253. Despite the clear and unambiguous prohibition against retaliation in the form of discrimination under Title 29, U.S.C. § 215, Plaintiffs were singled out, discriminated against, and suffered retaliation for the simple request that the Defendants comply with the Fair Labor Standards Act.

254. Plaintiff Randall Weston engaged in a protected activity alerting Defendants about the lack of overtime Plaintiffs and other similarly situated employees were receiving. All Plaintiffs were retaliated against for engaging in protected activity in engaging in collective action.

255. Defendants discriminated and retaliated against Plaintiff Randall Weston when Defendants scheduled Mr. Weston for an inordinate amount of scheduled flights because of his complaints, and similarly for other employees by either scheduling them for an increased amount of flying time or by reducing their flight experience, making them more undesirable in future employment.

256. As a result of Defendants' discrimination and retaliation, Plaintiffs have suffered and will suffer damages including, but not limited to, mental anguish and emotional distress. Plaintiffs are entitled to an award of compensatory, consequential, liquidated and punitive damages as a result of Defendants' conduct.

LAGOMARSINO LAW
3005 West Horizon Ridge Parkway, Suite 241, Henderson, NV 89052
Telephone (702) 383-2864 · Facsimile (702) 383-0065

1 | WHEREFORE, Plaintiffs pray that the Court:

2 | 1. As to the First Cause of Action, award back overtime pay in the form of one and a half times their

3 | effective hourly rates and liquidated damages;

4 | 2. As to the Second Cause of Action, award all available compensatory, consequential, liquidated

5 | and punitive damages; and

6 |

7 | 3. Award Plaintiffs their costs, prejudgment interest, and attorneys' fees incurred in pursuit of this

8 | action; and

9 | 4. Grant and award Plaintiffs such other and further relief as the Court deems equitable.

10 | DATED this 27th day of March, 2017

Respectfully submitted:

LAGOMARSINO LAW

ANDRE M. LAGOMARSINO, ESQ.
Nevada Bar No. 6711
3005 W. Horizon Ridge Parkway, Suite 241
Henderson, Nevada 89052
(702) 383-2864
*Attorney for Plaintiffs*

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiffs demand a trial by jury on all issues in this action.

DATED this 27th day of March, 2017

Respectfully submitted:

LAGOMARSINO LAW

ANDRE M. LAGOMARSINO, ESQ.
Nevada Bar No. 6711
3005 W. Horizon Ridge Parkway, Suite 241
Henderson, Nevada 89052
(702) 383-2864
Attorney for Plaintiffs