UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| SEAN KENNEDY, ANDREW SNIDER, CHRISTOPHER WARD, RANDALL WESTON, and RONALD WILLIAMSON, <br><br>Plaintiffs,<br><br>v.<br><br>LAS VEGAS SANDS CORP., and SANDS AVIATION, LLC,<br><br>Defendants. | Case No. 2:17-cv-00880-APG-VCF<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The plaintiffs are corporate jet pilots who flew for the defendants. They bring this lawsuit under the Fair Labor Standards Act (FLSA) seeking overtime pay for time they spent waiting between flights. ECF No. 55. I conducted a bench trial January 5-13, 2023. Below are my findings and conclusions, as required under Federal Rule of Civil Procedure 52(a).

## FINDINGS OF FACT

1. Sean Kennedy, Andrew Snider, Christopher Ward, Randall Weston, and Ronald Williamson (collectively, Plaintiffs) were employed by Sands Aviation, LLC and Las Vegas Sands Corp. (collectively, Defendants) as salaried, full-time, jet pilots. Plaintiffs flew Defendants' customers and high-level executives and family members on Defendants' planes.

2. Flights were usually scheduled at least one day in advance.[1] If Plaintiffs were not scheduled to fly on a particular day, they were required to be available to fly in case a "pop up flight" occurred, unless they were specifically scheduled as "off," sick, or on flex (vacation) time. Plaintiffs claim they are entitled to overtime pay for nearly all of the time they spent waiting for a

---

[1] *See*, *e.g.*, Ex. 1284 at 1-2 (24 hours' notice of flight), 3-4 (more than 24 hours' notice of flight), 10-11 4 (26 hours' notice of flight); Ex. 1291 at 9 (29 hours' notice of flight), 18-20 (33 hours' notice of flight); Ex. 1298 at 1-2 (35 hours' notice of flight), 28-29 (24 hours' notice of flight).

-1-

possible flight assignment (24 hours per day, 7 days per week) because they were always "on duty" when they were not on flex time, scheduled days off, sick time, or other approved time off.

3. Plaintiffs were paid between $125,000 and $160,000 annually (plus benefits) to fly domestically and internationally for Sands Aviation. They had no agreement with Defendants, in writing or otherwise, to provide them additional compensation beyond their salary for their waiting time between flight assignments. Plaintiffs had no expectation of additional compensation regardless of the hours worked (or not worked) per week.

4. Plaintiffs were advised of the compensation and unstructured work schedule for full-time pilots at Sands Aviation, and they voluntarily accepted the position. They continued to work for Defendants for several years under that arrangement.

5. Plaintiffs served as Pilot-In-Command (PIC) or Second-In-Command (SIC) on flights they flew for Sands Aviation.

6. As PICs, Plaintiffs had the ultimate decision-making authority on all flights and were responsible for the safety of all passengers, crew, and property. They had absolute authority and accountability to operate, delay, divert, or cancel a flight as circumstances dictated.[2]

7. As PICs, in emergency situations, Plaintiffs had complete discretion to deviate from prescribed operating procedures and regulations. In such situations, they had final authority as to the operation of the aircraft.[3]

---

[2] See Ex. 1194, General Operations Manual 91, at 3 (Preface: PIC "has absolute authority and accountability for decisions to operate, delay, divert or cancel a flight, as circumstances dictate"), 138 (Section 6.1.1: "It is the responsibility of the Pilot-In-Command to determine the airworthiness of his aircraft prior to flight."), 160 (Section 8.2.1: "The PIC is the final authority as to the operation of the aircraft."); Ex. 1212, Part 91 – General Operating and Flight Rules, at 131; 14 C.F.R. § 91.3(a) ("The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft."); 14 C.F.R. § 91.7(b) (PIC "is responsible for determining whether that aircraft is in condition for safe flight" and "shall discontinue the flight when unairworthy mechanical, electrical, or structural conditions occur.").

[3] See 14 C.F.R. § 91.3(b) ("In an in-flight emergency requiring immediate action, the pilot in command may deviate from any rule of this part to the extent required to meet that emergency."); Ex. 1194, General Operations Manual 91, at 160 (Section 8.2.3); Ex. 1212, Part 91 – General Operating and Flight Rules, at 131.

8.   Plaintiffs regularly had to interpret flight data, analyze weight and balance requirements, assess the airworthiness of their planes, make final decisions regarding the operation of the aircraft, and deviate from normal procedures as necessary, including overriding instructions from air traffic control in an emergency.

9.   Plaintiffs were not required to live on-premises at Sands Aviation.

10.   Plaintiffs were not required to remain within a certain distance of their homes or the Sands Aviation hangar on days they were to be available to fly.  But in the rare event of an immediate "pop up flight," they had to be able to get to the hangar one hour before the flight time. And they had to remain in areas where they had cell phone coverage unless they were temporarily excused by the scheduler.

11.   Plaintiffs were required to carry with them their company cell phones to receive emails and texts in the event a flight notification came in, and to respond to confirm their availability and fitness to fly.

12.   Plaintiffs were required to report for duty at the hangar one hour before the flight time.

13.   When Plaintiffs were contacted about an upcoming flight assignment, they were required to acknowledge the flight notification and confirm their availability to fly within 30 minutes. Ex. 1194 (General Operations Manual 91) at 133 § 5.6.4.[4]  During a trip, Plaintiffs were required to maintain communications with Defendants' Operations department and provide their contact information to passengers. *Id.*

---

[4] Some of the witnesses testified that a response was due in a "reasonable" period of time, but not necessarily 30 minutes. *See* ECF No. 382 (Trans.) at 56 (Jeff Saccoliti testifying Plaintiffs were to respond within a "reasonable amount of time, 30 minutes"); 181 (Thomas Mason testifying that Plaintiffs "were basically expected to respond in a reasonable manner.  And I know . . . what the [General Operations Manual] says . . . and we never held that to the tee."); ECF No. 383 (Trans.) at 216 (plaintiff Andrew Snider confirms Plaintiffs "were required to respond to flight notice emails . . . within a reasonable time").

14. Plaintiffs often replied to such emails and texts with short comments such as "Got it," "Got thx," "Yes confirmed," or even emojis.[5]

15. Failure to respond within 30 minutes did not result in formal disciplinary action, but some of the Plaintiffs were informally spoken to by their supervisor about not timely responding.[6] If Plaintiffs did not respond to a flight notification, the scheduler usually attempted further contact with the pilot. If necessary, the scheduler moved down the list to the next pilot.

16. Sands Aviation also engaged other pilots who worked on a day-to-day basis and who could cover flights when none of the full-time pilots was available.

17. Plaintiffs were allowed to, and did, reject flights for various reasons, usually due to illness.

18. The scheduling department routinely granted Plaintiffs' time-off requests to attend yoga classes, doctor appointments, dental visits, and to engage in other personal activities, none of which counted against their flex time or scheduled days off.

19. Plaintiffs engaged in various personal activities during their non-flight time, including going to dinner with family and friends; watching movies at home and in theaters (although rarely); going to the gym and fitness classes to work out; going on family outings; maintaining swimming pools; performing maintenance on personal vehicles; shopping at liquor stores, car dealerships, and auto parts stores; and other activities benefitting Plaintiffs rather than Defendants.

20. Some Plaintiffs engaged in secondary employment while waiting for flights. Sean Kennedy worked at P-R-N Aviation, Executive Jet Management, and In-Flight Crew Connections. Randall Weston piloted flights for Pacific Dental Services and Switch. Ronald Williamson worked at P-R-N Aviation and Hensel Phelps, and also drove for Lyft and Uber. Christopher Ward ran an internet marketing business.

---

[5] *See, e.g.*, Ex. 1284 at 1-2 (Ward); Ex. 1291 at 9 (Weston), 18-20 (Weston).

[6] *See, e.g.*, ECF Nos. 383 (Trans.) at 149-50 (Andrew Snider testifying about verbal discipline for not responding quickly enough); 385 (Trans.) at 34-35 (same).

-4-

**CONCLUSIONS OF LAW**

1. "In a suit brought under the FLSA, the employee has the burden of proving that the employee was not properly compensated for work performed." *Imada v. City of Hercules*, 138 F.3d 1294, 1296 (9th Cir. 1998).

**I. Plaintiffs were exempt from the overtime provisions of the FLSA as highly compensated employees.**

2. An employee is exempt from the FLSA overtime provisions if they qualify as a "highly compensated employee" (HCE). The HCE exemption applies if:

> (1) the employee earns total annual compensation of $100,000[7] or more;
>
> (2) the employee "customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee;" and
>
> (3) the employee's "primary duty includes performing office or non-manual work."

29 C.F.R. § 541.601.

3. The Supreme Court of the United States has confirmed that such exemptions "are as much a part of the FLSA's purpose as the overtime-pay requirement," and are not to be construed narrowly. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

**A. Plaintiffs' annual salaries met the compensation test.**

4. Plaintiffs admit they were paid between $125,000 and $160,000 annually during the relevant period. Thus, the first prong of the HCE exemption is satisfied.

**B. Plaintiffs customarily and regularly performed one or more of the exempt duties of an administrative employee.**

5. "A high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties." 29 C.F.R. § 541.601(c). "In crafting the highly compensated employee exemption, the Department of Labor made it easier on both employers and courts. [Courts] need not conduct a particularly detailed

---

[7] This amount has increased since the period relevant to this case.

analysis of the employee's job duties [because the employee's] level of compensation is the principal consideration." *Smith v. Ochsner Health Sys.*, 956 F.3d 681, 688 (5th Cir. 2020) (simplified). Because Plaintiffs were highly compensated, I do not need to conduct a detailed analysis of their job duties.

6. In addition, this second prong of the HCE exemption "does not require the same level of job-duty scrutinizing as the standalone exemption" of an executive, administrative, or professional employee. *Smith*, 956 F.3d at 685. Rather, the employee need perform only one of the duties of one of those types of exempt employees. 29 C.F.R. § 541.601(c).[8]

7. As relevant here, an exempt "administrative" employee is one whose "primary duty . . . includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

8. "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.*

> Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. *Id.*

9. Here, Plaintiffs' primary duty was the safe transport of their passengers. Carrying out that duty involved a myriad of decisions and actions, including:

---

[8] *See also* 29 C.F.R. § 541.601(a)(1) (HCE need only customarily and regularly perform one of these duties to qualify as exempt); *Smith*, 956 F.3d at 685 (finding that test is disjunctive when relying on exempt administrative duty to fulfill HCE exemption test). Therefore, "employees may be exempt as *administrative* HCEs even if they do not meet all the elements in the standalone administrative exemption." *Smith*, 956 F.3d at 685 (emphasis in original). *See also McCoy v. North Slope Borough*, No. 3:13-CV-00064-SLG, 2013 WL 4510780, at *9 (D. Alaska Aug. 26, 2013) ("For highly compensated employees, it is sufficient if one of these components is demonstrated.").

-6-

    -overseeing selection of the route to take (with assistance and guidance from outside vendors and air traffic controllers);

    -inspecting the logbook and plane and determining whether the plane was airworthy;

    -confirming the plane's center of gravity and that the weight was balanced;

    -operating the plane's controls throughout the trip (including taxiing, takeoff, flight, and landing);

    -analyzing and responding to problems and emergencies that arose, such as engine failure, wind shear, bird strikes, pre-flight and inflight de-icing, lightning strikes, contaminated runways, aircraft fires, in-flight illness and injury, and many other scenarios;

    -reacting to changing weather conditions during the flight;

    -identifying and deciding whether to land at an alternate airport; and

    -inspecting the plane post-flight and reporting any incidents or problems.

10. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).

11. Flying a plane is a dynamic scenario and pilots must refocus, recalibrate, and adapt their work during flights. ECF No. 391 (Trans.) at 109 (Weston). Plaintiffs testified that they must diagnose and actively resolve problems they encounter during a flight to avoid catastrophic consequences. *Id*. at 104-109.

12. Plaintiffs made decisions about the route based on factors like weather and runway length. They decided how much fuel to load. While taking off and landing, they had to account for wind, airport elevation, weight of the plane, and temperature. *Id*. They could alter the flight plan if they encountered weather systems or turbulence during the flight, and they could refuse to take off or land if "something looked amiss." ECF No. 392 (Trans.) at 114 (Williamson). "In an

in-flight emergency requiring immediate action, the pilot in command may deviate from any rule . . . to the extent required to meet that emergency." 14 C.F.R. § 91.3(b).

13. Plaintiffs' duties, including those summarized above, required them to evaluate and decide upon various courses of conduct.[9] Defendants dictated where Plaintiffs would fly to and from, but Plaintiffs were responsible for deciding the route and performing the duties necessary for each flight.

14. While Plaintiffs could and did rely on technical manuals and checklists to help them perform their duties, that does not preclude exemption under the FLSA. *See* 29 C.F.R. § 541.704.

15. In *McCoy*, the court found search-and-rescue pilots exempt as HCEs, noting the problem-solving nature of flying and that pilots "must constantly exercise their discretion and independent judgment without direct supervision when they are flying aircraft." 2013 WL 4510780 at *10-11. Although there are differences in the types of flights performed by search-and-rescue pilots and Plaintiffs here, Plaintiffs exercised discretion and independent judgment when serving as the PIC on flights for Defendants. They had absolute authority and accountability for the operation of the jets they flew. 14 C.F.R. §§ 91.3 and 91.7; Ex. 1194 (General Operations Manual 91) at 3 (Preface), 160 (Section 8.2.1).

16. Thus, in carrying out their primary duty, Plaintiffs were required to act with independence and discretion. And safely flying a plane obviously constitutes a matter of significance. Accordingly, Plaintiffs customarily and regularly performed one or more exempt administrative duties.

C.  **Plaintiffs' primary duty was not manual labor.**

17. The third prong of the HCE test states that the exemption "applies only to employees whose primary duty includes performing . . . non-manual work." 29 C.F.R. § 541.601(d). The regulation lists examples of workers who do not qualify for this exemption, including "non-management production-line workers and non-management employees in maintenance,

---

[9] I have also examined Plaintiffs' primary job duties in the context of the considerations listed in 29 C.F.R. § 541.202.

construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees who perform work involving repetitive operations with their hands, physical skill and energy." *Id.*

18. Plaintiffs argue they performed manual labor because they lifted and loaded luggage onto planes, crawled into or maneuvered around tight areas, and used their hands and feet to fly the planes. They also cite to Defendants' Job Description Form requiring pilots to "[m]aintain physical stamina." Ex. 1197 p. 1. Plaintiffs no doubt performed some physically-demanding tasks in connection with their jobs. But that does not change the fact that their primary duty was to fly the planes safely. "The mere fact that an exempt employee performs some manual work does not convert that employee to a non-exempt laborer. . . . In the context of the HCE exemption, courts routinely hold that performing some manual labor does not negate the exemption when the employee's primary duty is exempt work." *Venable v. Schlumberger Ltd.*, No. 6:16-CV-00241 LEAD, 2022 WL 895447, at *9 (W.D. La. Mar. 25, 2022).[10]

19. I agree with the *McCoy* court that "[f]lying an airplane is not manual labor." *McCoy*, 2013 WL 4510780, at *10. "While the use of one's hands is required, it is the non-manual decision-making that is the key to the successful operation of an airplane." *Id.*

20. A "pilot flying an airplane is not performing work similar to the 'blue-collar' occupations identified as manual work in the regulation, but rather is performing non-manual work of a highly technical nature that requires extensive and specialized training." *Id.* (referring to 29 C.F.R. § 541.601(d)). *See also Venable*, 2022 WL 895447 at *9 (finding that plaintiffs performed office or non-manual work because their primary duties required them to monitor data and provide direction or advice, which "is not manual labor"); *Boudreaux v. Schlumberger Techn. Corp.*, No. 6:14-CV-02267, 2022 WL 992670, at *8 (W.D. La. Mar. 30, 2022) (same). Although

---

[10] Plaintiffs' argument would hold surgeons and lawyers to be non-exempt laborers because they use their hands to perform repetitive operations with "physical skill and energy." *See* 29 C.F.R. § 541.601(d).

Plaintiffs used their hands and feet to fly the plane, their judgment, aviation acumen, and decision-making skills were far more important to the job of safely piloting a plane.[11]

21. Plaintiffs rely on Department of Labor (DOL) Opinion Letter FLSA2018-3 to support their assertion that they performed manual labor. *See* ECF No. 363-2 (DOL Opinion Letter FLSA2018-3). That letter opined that certain helicopter pilots did not qualify for the FLSA's executive, administrative, or professional exemptions, in part because "their primary duty is piloting a helicopter, which does not qualify as 'office or non-manual' work. *See* 29 C.F.R. § 541.200(a)(2)." *Id.* at 3. But that letter is inapposite here.

22. First, the skills and duties of helicopter pilots are different from those of Plaintiffs here, who fly planes at higher altitudes, faster, and with multiple passengers.

23. More importantly, the letter offers no support or analysis for its holding that the helicopter pilots' primary duty does not qualify as non-manual work. The letter does not describe what the pilot's primary duty is and what tasks or important functions go into fulfilling that duty. Thus, the opinion letter is unhelpful here, so I make my decision based upon my own analysis of the relevant facts in this case.

24. Plaintiffs' primary duty was not manual labor. 29 C.F.R. 541.601(d).

25. Plaintiffs satisfy all three prongs of the HCE exemption and thus were exempt from the FLSA's overtime provisions. 29 C.F.R. § 541.601.

## II. Plaintiffs' waiting time between flight assignments was not compensable time under the FLSA.

26. Even if Plaintiffs were not exempt from overtime under the FLSA, they are not owed overtime pay because they did not work more than 40 hours per week.

27. Where, as here, Plaintiffs worked without a set schedule, the relevant inquiry is whether "the employee was engaged to wait, which is compensable, or . . . the employee waited to

---

[11] Further, Plaintiffs testified that during long periods of some flights, the plane would be set on auto-pilot, relieving the pilot from the need to keep his hands (and feet) on the wheel.

-10-

be engaged, which is not compensable." *Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992) (simplified).

28. "The regulations at 29 C.F.R. § 785.14-17, which clarify the 'waiting to be engaged' doctrine, clearly state that an employee is only compensable for idle time when 'the employee is unable to use the time effectively for his own purposes.'" *Id.*

29. "This does not imply that the employee must have substantially the same flexibility or freedom as he would if not on call, else all or almost all on-call time would be working time, a proposition that the settled case law and the administrative guidelines clearly reject." *Bright v. Houston Nw. Med. Ctr. Survivor, Inc.*, 934 F.2d 671, 677 (5th Cir. 1991) (quoted in *Owens*, 971 F.2d at 350-51). "The proper inquiry is whether an employee is so restricted during on-call hours as to be effectively engaged to wait." *Berry v. Cnty. of Sonoma*, 30 F.3d 1174, 1182 (9th Cir. 1994) (simplified).

30. The resolution of this issue focuses on "two predominant factors: (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties." *Owens*, 971 F.2d at 350. The label attached to the employee's waiting time (e.g., "on duty" or "on call") does not override these factors. *Varner v. Shoreside Petroleum, Inc.*, 817 F. App'x 470, 471-72 (9th Cir. 2020) (employee "cannot escape *Owens*'s ambit simply by proclaiming that he was always 'on duty'").

**A. The parties did not have an agreement entitling Plaintiffs to additional compensation for their waiting time between flight assignments.**

31. Taking the second factor first, the parties did not have any agreement, in writing or otherwise, about additional compensation for Plaintiffs' waiting time between flight assignments.

32. Plaintiffs were advised of the compensation and unstructured work schedule for full-time pilots at Sands Aviation and accepted the position. And each of the Plaintiffs kept working for Defendants for years under that pay and work structure.

33. Plaintiffs had no expectation of additional compensation beyond their annual salaries and benefits regardless of the hours worked per week.

-11-

34. Accordingly, this factor favors Defendants.

**B.** **<u>Plaintiffs engaged in a variety of personal activities during their waiting time.</u>**

35. In *Owens*, the Ninth Circuit "provided an illustrative, non-exhaustive list of factors to be analyzed in determining the degree to which an employee is free to engage in personal activities while on call." *Berry*, 30 F.3d at 1183 (citing *Owens*, 971 F.2d at 351).

36. These "*Owens* factors" include whether: (1) there was an on-premises living requirement; (2) there were excessive geographical restrictions on the employee's movements; (3) the frequency of calls was unduly restrictive; (4) a fixed time limit for response was unduly restrictive; (5) the employee could easily trade on-call responsibilities; (6) use of a pager could ease restrictions; and (7) the employee had actually engaged in personal activities during on-call time. *Berry*, 30 F.3d at 1183 (citing *Owens*, 971 F.2d at 351).

37. "Because no one factor is dispositive, a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait." *Berry*, 30 F.3d at 1183 (simplified).

38. Here, the *Owens* factors support a finding that Plaintiffs were free to engage in personal activities during their waiting time between flight assignments.

39. <u>(1) On-Premises Living Requirements</u>: Plaintiffs were not required to live at the Sands Aviation hangar.

40. <u>(2) Geographical Restrictions</u>: Plaintiffs were not required to remain within a specific distance of their home or the hangar on days they were to be available to fly. But in the rare event of an immediate "pop up flight," they had to be able to get to the hangar one hour before the flight time. They had to carry their company cell phones to receive and respond to emails and texts in the event a flight notification came in, so naturally they had to remain in areas where they had cell phone service. Plaintiffs carried travel bags in their cars, often drove separately from their partners when going out to dinner or a social event, and usually remained within an hour's drive time from the hangar in case of an immediate flight. But it was rare that a

pilot had to report to the hangar immediately. Thus, while there were some geographical restrictions on Plaintiffs, those restrictions were not excessive.

41.  (3) Frequency of Calls: Plaintiffs argue they were always "on duty" given the number of flight-related communications they received. But inclusion in a mass email to all pilots about general matters is different from actually being notified of a flight assignment. Plaintiffs received far fewer emails and texts each week about actual flight assignments. The frequency of those communications was not unduly restrictive or burdensome. *See Bright*, 934 F.2d at 674 (on-call time not compensable when employee received an average of five calls per week to return to hospital for work); *Roces v. Reno Hous. Auth.*, 300 F. Supp. 3d 1172, 1194 (D. Nev. 2018) ("ten to twenty calls per month pales in comparison to the call frequencies at issue in cases where on-call time was found to be compensable"). *Cf. Berry*, 30 F.3d at 1186 (frequency of calls could support compensable time when coroners received a "death report" call they had to attend to in person, on average, every 6.45 hours).

42.  (4) Required Response Time: When Plaintiffs were contacted about an upcoming flight, they were required to acknowledge that notification and confirm their availability to fly within 30 minutes. Ex. 1194 at 133 § 5.6.4. They often replied with short comments. Failure to respond within 30 minutes did not result in formal disciplinary action, although at least one of the Plaintiffs was verbally disciplined for not timely responding.[12] Further, Plaintiffs were rarely required to immediately go to the hangar upon receiving a flight notification because flights were generally scheduled at least a day in advance. Thus, the required response times were not unduly restrictive.

43.  (5) Ability to Trade On-Call Responsibilities: While there was no formal trading of on-call or flight assignments, if Plaintiffs did not respond to a flight notification or indicated they were unavailable for a flight, the scheduling department contacted the next pilot on the list. Sands

---

[12] *See* ECF Nos. 383 (Trans.) at 149-50 (Andrew Snider testifying about verbal discipline for not responding quickly enough); 385 (Trans.) at 34-35 (same).

Aviation also engaged contract pilots who worked on a day-to-day basis to serve as back-ups when necessary. Further, Plaintiffs were allowed to, and did, reject flights for various reasons.

44.  <u>(6) Use of Pager or Other Devices to Ease Restrictions</u>: Plaintiffs were provided company-paid cell phones to receive and respond to calls, texts, and emails from Sands Aviation. The use of such devices—which allowed Plaintiffs to leave their homes and receive notifications as they went about their day—has been found to ease worker restrictions and thus weighs against a finding that time waiting is compensable. *See Henry v. Med-Staff, Inc.*, No. SA CV 05-603 DOC ANX, 2007 WL 1998653, *11 (C.D. Cal. July 5, 2007) ("Cell phones likewise ease restrictions, by freeing employees to travel wherever they wish during on-call assignments as long as their destinations have cell phone reception or a landline telephone to which they may forward calls."); *Berry*, 30 F.3d at 1184 ("use of pagers eases restrictions while on-call and permits [employees] to more easily pursue personal activities").

45.  <u>(7) Personal Activities of Plaintiffs</u>: Plaintiffs engaged in a variety of personal activities during their non-flight time, including going to dinner with family and friends; watching movies at home and at movie theaters (although rarely); going to the gym and fitness classes on a regular basis; going on family outings; maintaining swimming pools; performing maintenance on personal vehicles; shopping at liquor stores, car dealerships, and auto parts stores; and other activities benefitting Plaintiffs rather than Defendants. Most of the Plaintiffs engaged in secondary employment while on call, including running an internet business, flying or working for other air carriers, and driving for Uber and Lyft. The scheduling department routinely granted Plaintiffs' ad hoc time-off requests to attend yoga classes, doctor appointments, dental visits, and to engage in other personal activities, none of which counted against their vacation or scheduled days off.[13]

47.  In sum, the *Owens* factors favor Defendants.

/ / / /

/ / / /

---

[13] Such time off was in addition to Plaintiffs' accrued flex time, sick days, and scheduled days off.

48. Thus, Plaintiffs' time waiting between flights was not compensable under the FLSA.[14] Plaintiffs have no overtime claim against Defendants.

## CONCLUSION

Plaintiffs were exempt from the overtime provisions of the FLSA under the HCE exemption. And even if they were not exempt, Plaintiffs did not work overtime during the relevant period. Accordingly, Plaintiffs' claim for overtime pay under the FLSA fails.

I THEREFORE ORDER that Defendants are entitled to judgment in their favor on Plaintiffs' claim in the First Amended Complaint (ECF No. 55).

I FURTHER ORDER the clerk of the court to enter judgment accordingly and to close this case.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT COURT JUDGE

DATED: February 7, 2023

---

[14] Ninth Circuit case law supports this conclusion. *See, e.g.*, *Berry*, 30 F.3d at 1180-87; *Owens*, 971 F.2d at 350-55; *Roces*, 300 F. Supp. 3d at 1194-97. Case law from other circuits likewise supports this conclusion. *See e.g.*, *Armitage v. City of Emporia, Kan.*, 982 F.2d 430, 432-33 (10th Cir. 1992); *Birdwell v. City of Gadsden, Ala.*, 970 F.2d 802, 807-10 (11th Cir. 1992); *Bright*, 934 F.2d at 676.